# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00614-COA

IN THE MATTER OF L.C., MINOR CHILD, A.L.,         APPELLANT
MINOR CHILD, AND C.C., MINOR CHILD:
JANE DOE

v.

BOLIVAR COUNTY YOUTH COURT         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/02/2022 |
| TRIAL JUDGE: | HON. WILLIAM HUNTER NOWELL |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JENNIFER LOUISE MORGAN |
| | CHAD KENNETH KING |
| | CHAKA DENISE SMITH |
| ATTORNEY FOR APPELLEE: | S. DAVID NORQUIST |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 09/17/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Jane Doe's three daughters (Lucy, Amy, and Catherine)[1] were adjudicated to be neglected children, removed from Doe's custody, and placed in the custody of the Mississippi Department of Child Protection Services (MDCPS). MDCPS developed a family service plan with the goal of reunifying Doe and her children, and the youth court ordered MDCPS to make "reasonable efforts" to assist Doe in achieving reunification. The youth

---

[1] We use pseudonyms in the interest of the family's privacy. At the time the children were removed from Doe's custody, Doe was twenty-seven years old, Lucy was five years old, Amy was three years old, and Catherine was one month old.

court found that Doe complied with MDCPS's family service plan for nearly two years, did everything that MDCPS required of her, and ultimately completed her service plan. During this time, Doe regained custody of Lucy and Amy. In addition, MDCPS and the youth court consistently encouraged Doe that she was on track for reunification with Catherine.

¶2.     But as Doe neared her anticipated reunification with Catherine, MDPCS and the youth court reversed course and found that Doe had not satisfactorily completed her service plan. In doing so, the youth court found that MDCPS had misrepresented its own efforts to assist Doe, as well as Doe's successes, and otherwise "turned a blind eye" to Doe's failures. Nonetheless, the youth court also found that MDCPS had made the requisite "reasonable efforts" toward reunification, modified Catherine's permanency plan from reunification to adoption, and ordered MDCPS to initiate termination of parental rights (TPR) proceedings. The court left Lucy and Amy in Doe's custody. Doe appealed the youth court's order regarding Catherine. Because we find that there is no substantial evidence to support the youth court's "reasonable efforts" finding, we reverse and remand for MDCPS to make "reasonable efforts" to reunify Doe and Catherine.

**FACTS AND PROCEDURAL HISTORY**

¶3.     On June 9, 2020, MDCPS received a report that Doe "was driving erratic with [her] children in the car." The anonymous reporter alleged that Doe "seemed to be spaced out" and was "shut[ting] down" such that the reporter "did not feel safe . . . leaving the children with" Doe. The next day, an MDCPS worker visited Doe and her three daughters, and Doe "admitted that she had been doing drugs such as crystal meth and marijuana" inside her home

2

two days earlier while "her children were unattended outside of the home." MDCPS also noted that Doe was unemployed, behind on her rent, and was being evicted from her home. MDCPS notified the Bolivar County Youth Court, which held a shelter hearing and ordered that Amy and Lucy be placed in the temporary custody of their paternal aunt and that Catherine be placed in MDCPS custody. Catherine was later placed with a foster family. On June 11, 2020, MDCPS filed a petition alleging that Lucy, Amy, and Catherine were neglected children, but no adjudication hearing would be held until October 2020.

¶4. Based on Doe's condition at the shelter hearing, she was taken directly to the drug detox program at Delta Regional Medical Center. On June 16, 2020, Doe was admitted to a drug rehabilitation program at Life Core Rehabilitation Center. She completed the program and was released from Life Core on July 22, 2020. However, Doe had no plan, home, or support system. She moved into a hotel in Cleveland, but it became too expensive. On August 8, 2020, she informed MDCPS that she had gone to live with her brother in Itawamba County until she found housing and a job. MDCPS reported that Doe initially struggled with visitation due to actively searching for housing and employment and having moved about three hours away from her children, who were still in Bolivar County. But MDCPS's records note that Doe "ask[ed] about the visitation with her children," "want[ing] to see her children face2face," but "due to the pandemic," face-to-face visitation was not an option. Therefore, MDCPS told Doe that she would have to exercise visitation "via FaceTime or [G]oogle [D]uo." In September 2020, Amy and Lucy were removed from their paternal aunt's custody and placed in MDCPS's custody after it was discovered that their aunt had returned the

3

children to Doe in violation of the youth court's order.

¶5. On September 29, 2020, MDCPS adopted a family service plan with the goal of reunification. It required that Doe "attend and complete drug rehab before being reunified with her children," "submit to random drug screening to ensure she is free drug [sic] any and all drug usage before being reunified with her children," "keep in contact with her children face to face and by phone to ensure she maintains a healthy connection with all of them," "seek and maintain stable housing before being reunified with her children," "comply with the agency," "inform the agency with update [sic] address, contact numbers, or change of visitation," "locate and maintain employment," and "have visitation face to face on Saturdays and via Face[T]ime once a week."

¶6. An adjudication hearing was finally held in October 2020, and the youth court adjudicated all three children to be neglected. The court held a disposition hearing the same day, placing all three children in MDCPS's custody. The court also found that reunification with Doe was in all three children's best interest and adopted a permanency plan to that effect, ordering MDCPS to make reasonable efforts toward reunification.

¶7. In December 2020, the youth court held its first permanency hearing, and by all accounts, Doe was completing her family service plan and was "really close to getting [her] kids back." At that hearing, Shumeka Jackson, an MDCPS case worker, testified that all three children were doing well and that Catherine was "visiting with her mother via FaceTime with some face-to-face visits." Jackson testified that Doe was compliant with her service plan, that she was employed and had housing, that she was in the process of

furnishing her home, and that she was working with members of her church to help establish a plan for childcare. Jackson stated that Doe had "tested negative for all her drug screenings that she ha[d] taken" and would submit to another drug test following the hearing. After hearing Jackson's testimony, the youth court stated that "maybe after the first of the year we can try placing the older two back in [Doe's] care" to "see how that goes," and then, "[i]f all of that goes smoothly, then we can get the baby in just a little bit later." In its subsequent permanency order, the court noted that Doe was "close to completing her goals" in her service plan and ordered her to maintain compliance with her plan.

¶8. Doe's progress continued, and by the court's second permanency hearing on February 25, 2021, all were optimistic that reunification with all three children was near. At that hearing, Jackson testified that on February 12, 2021, Doe had "picked up [Lucy and Amy] to start her 90-day home trial placement," which Jackson characterized as "good news." Jackson testified that she was "so proud of [Doe]" and that Doe

> has completed her service agreement. [She] has located and maintained a home. [She] has kept her job, and she has been stable on her job. [She] has taken numerous amounts of drug screenings and all of them have been negative. [She] has been coming down to visit her children face-to-face. She has also called them over the phone. . . . So, [Doe] has done a remarkable job. I really think we need to give [Doe] a handclap.

The transcript of the hearing then reads: "(Everyone applauds [Doe])." Following MDCPS's recommendation, the court stated:

> We can go ahead and schedule a review maybe in, let's say, 60 days to see how things are going with the older two kids. If things are going well, then we will look at getting [Catherine] back in the home as well. I just don't want to put a baby, you know, all three of them on you at the exact same time. It might be overwhelming at first, but we'll go ahead and get it scheduled for a couple of

5

months down the road. So, if everything is going okay, we'll get [Catherine] back in the home as well. And good job; I'm proud of you.

Thus, in February 2021, Doe was being told that she had done everything asked of her by the youth court and MDCPS, that her efforts were sufficient in the eyes of the court and the agency, and that reunification with all her children was in sight. After that hearing, the youth court entered a permanency order, noting that Doe had "completed her Family Service Plan," that MDCPS had "documented compelling and extraordinary reasons why [TPR] would not be in the interests of [Catherine]," and that Doe should continue to maintain housing and employment, exercise visitation with Catherine, and submit to random drug screens.

¶9. On July 6, 2021, MDCPS submitted a "Youth Court Hearing and Review Summary" that stated that Doe "appear[ed] to be fully compliant with her service agreement." The report further stated that Doe had "maintained stable housing and income, successfully completed rehab, and has maintained compliance with random drug screens and supervised visitation." At that time, according to MDCPS, Doe "maintain[ed] twice monthly supervised visitation with [Catherine,] and the siblings maintain[ed] twice monthly sibling visitation." The report also stated that Doe "is maintaining a home while maintaining connections with [Catherine]." MDCPS also advised that the risk associated with Catherine returning home was "low" and that Catherine would be "safe" in Doe's custody.

¶10. In August 2021, as MDCPS and the youth court prepared to place Catherine back in Doe's home on a trial basis, Doe asked the court for more time to prepare to take custody of Catherine, who was about sixteen months old at the time. During the August permanency hearing, Jackson testified that Amy and Lucy were still in Doe's custody, that they were

attending daycare, and that Doe had registered them for school. Jackson also testified that Doe and Catherine's sisters were "also having face-to-face visits" and "FaceTime visits with [Catherine]," whose foster family had moved from Bolivar County to Rankin County.[2] Jackson further testified that Doe had "completed her service agreement." However, Jackson noted that Doe had recently moved into a one-bedroom home due to an issue with her previous home, which "wasn't solely her fault," and that at the time of the hearing, she was "looking to locate a bigger home . . . for her family." Accordingly, Doe "recognize[d] that as far as stability," she still had "a little bit further to go" and asked for more time to prepare to take custody of Catherine. Still, Jackson testified that Doe

> has had the girls for the 180 days or more. She has been able to, you know, provide for them and take care of them. She is getting back into her stability space where she is back at work. The girls are going to school, which they were going to daycare before school started. So she is getting back into, you know, being more stable than she was initially. It is just that some issues with [Lucy], being [Lucy] was diagnosed with autism. So I feel like she really needs to get [Lucy] under control and get her into the school that she is going to be to make sure she is being provided the appropriate services. That's a big thing and that's what's kind of throwing her back with not being able to get [Catherine] . . . because [Lucy] is such a handful. She is a handful. So she is doing her best at trying to get [Lucy] stable as well.

At that point, the county prosecutor noted that he "certainly [thought Doe was] well on her way" and that "[s]he has done everything we have asked her to do." The youth court ultimately stated that it was "not ready to close things out on [Amy] and [Lucy] yet" and postponed consideration of "get[ting Catherine] back into the home" for six months. The court stated that it would review the case in six months and might "close it all out at one

---

[2] It appears that the foster family had moved to Rankin County around June 2021.

time." The youth court made no significant changes from its prior permanency order and set the case for review in 180 days.

¶11. In a December 2021 "Youth Court Hearing and Review Summary," MDCPS stated that "[t]he next court hearing is scheduled for February 2022, and, if the mother is still making progress, it will be requested that [Catherine] begin Trial Home Placement." The report continued to state that "[t]he children ha[d] a strong emotional connection with [Doe]" and that Catherine could be safely returned to Doe's care. MDCPS again reported that Doe was still "maintaining a home while maintaining connections with [Catherine]." MDCPS's recommendation remained unchanged—that Doe should be reunited with Catherine.

¶12. The course of the case changed dramatically when the youth court held a final permanency hearing on April 7, 2022. After two continuances "on the [c]ourt's own motion," MDCPS and the GAL submitted reports, testified, and recommended that Catherine's permanency plan should change from reunification to adoption. Following the hearing, the youth court adopted that recommendation.

¶13. Five days before the April permanency hearing, MDCPS submitted a "Court Summary" to the youth court. MDCPS described Doe's "current situation" as having "completed her service agreement with the agency," living in a three-bedroom home with sufficient utilities and food, and "taking care of her daughters." Doe was employed at a restaurant and reported that "she ha[d] a good relationship with her church family who [would] assist her with the children." Nonetheless, MDCPS recommended that Catherine's permanency plan be modified from reunification to adoption because she had been in

8

MDCPS's custody for more than fifteen months. MDCPS also recommended that the "court order TPR on mother" (i.e., termination of parental rights). The day before the permanency hearing, the GAL also submitted a report to the youth court. The GAL's report stated that Doe reported speaking with Catherine often but that Doe could not specify how many times per week she talked to Catherine. The GAL also reported that the foster mother had told the GAL that Catherine "does not know [Doe] as her mother" and that Catherine now calls her foster parents "Mom" and "Dad." The GAL acknowledged that Doe was "in compliance with MDCPS and ha[d] completed her service agreement with MDCPS." Nonetheless, the GAL recommended that modifying Catherine's permanency plan from reunification to adoption would be in Catherine's best interest.

¶14. At the April permanency hearing, the GAL and an MDCPS case worker testified, and both recommended that—despite the progress they had reported for a year and a half—the youth court should modify Catherine's permanency plan to adoption. At that hearing, Idalecia May, an MDCPS case worker, contradicted Jackson's testimony at the three previous hearings. May testified that Lucy and Amy had been in Doe's custody on a trial basis for only "right at six months."[3] Moreover, May testified that Doe "hasn't had any in-person visits with [Catherine] probably in the last two years," which contradicted Jackson's testimony at prior hearings that Doe was having face-to-face visits with Catherine.[4] As a

---

[3] This was obviously incorrect. Lucy and Amy began a 90-day trial in Doe's custody in February 2021 and, thus, had been in Doe's custody for more than thirteen months. May later conceded that she was wrong.

[4] Jackson's testimony may not have been accurate either, but at least some face-to-face visits had occurred during the two-year period.

result, May testified that Doe "really don't have a relationship with [Catherine]." May conceded that Doe had done everything MDCPS had asked her to do. Even so, May recommended "that the permanent plan for [Catherine] change to adoption due to her being in [MDCPS] custody over the 15-month period, according to [MDCPS] policy,"[5] and that Lucy and Amy "be placed in the care and supervision of their mother." The GAL also testified and agreed with MDCPS's recommendation, stating that Catherine was almost two years old, that she was "in a stable home," and that "[i]t may not be in her best interest at this point" to be removed from the foster home because she "may have a better parent-child relationship [with her foster parents] than [with Doe]."

¶15.    The foster mother (Carrie) also testified that there was no relationship between Catherine and Doe and that she and her husband intended to adopt Catherine if possible. Carrie testified that FaceTime visits were difficult because Catherine was only two years old, but in the two weeks leading up to the hearing, Doe visited with Catherine on FaceTime every day. However, according to Carrie, Doe's FaceTime visits were previously more "sporadic." Carrie testified that she previously had talked to Doe "maybe twice a month" or "[s]ometimes . . . twice a week" and that at times a month would pass without Doe contacting her. In addition, Carrie testified there had never been a time that Doe asked her to bring Catherine to Doe when she had not done so.[6]

---

[5] *See infra* note 8.

[6] The record includes several documents that were filed after the April 2022 permanency hearing and were not admitted into evidence at any of the hearings in the youth court. The foster family appears to have submitted several of these documents, including an unsworn, handwritten document that appears to give the foster family's perspective on

10

¶16. In his closing argument, the county prosecutor argued that the youth court should adopt MDCPS's recommendation and modify Catherine's permanency plan to adoption. The prosecutor took issue with Doe's participation in the hearing by telephone. Doe testified that car trouble had required her to appear telephonically. But the prosecutor argued that Doe's "inability to obtain transportation to get [to the hearing] call[ed] into question . . . whether or not she ha[d] the ability to take care of [Lucy and Amy]," let alone Catherine.

¶17. However, Doe testified that she did have a relationship with Catherine and deserved a chance to regain custody of her. Doe testified that she and Catherine visited via FaceTime. Doe said that she had "asked previously about [the foster family and Catherine] coming to visit, because [she] had car trouble." But Doe claimed that she "didn't receive any message back from [Carrie]." Doe also testified that Catherine "is a two-year-old child and she doesn't really sit still on the phone." Aside from difficulties with visitation, Doe testified that she had been living in a stable home for at least one year, that she was employed, and that she had complied with everything else in her "family service plan." Doe testified that she was prepared to have custody of Catherine and that Catherine "deserve[d] a chance to have contact with [her] and to come home with [her]." In closing, Doe's attorney argued,

> If [Doe] has done everything [MDCPS] ha[s] asked her to do then she should
> have the opportunity to be reunified with her child. There have been no

_____

Doe's efforts. There are also text messages that, if authentic, show the foster family often gave Doe financial support and offered to keep Amy and Lucy on occasion; however, the dates and times of the text messages are illegible. Finally, there are copies of arrest warrants issued for Doe in early 2021 for Doe's nonpayment of fines for speeding, an expired tag, and failing to have motor vehicle insurance. In January 2022, Doe was arrested for her nonpayment of these fines. The foster family apparently paid the fines for Doe. The records have handwritten notations on them purporting to be made by "Carrie."

11

reasonable efforts . . . to allow [Catherine] to go back [to live with Doe] and show [MDCPS] that she can take care of her child. The reason [Catherine] was taken was for [Doe's] drug use. She has been clean. She has not tested positive. . . . She has a house. She has a job. But [they] want to penalize her for making a decision not to come [to the hearing] today. But you have to know that decision was based on two things. If she comes here with a messed up car and she can't go back, we have got two other children who are left abandoned at a school because [Doe] cannot pick them up. So she's got to make a choice. . . . Since she can appear here via phone, I had rather her stay with the other two kids. . . . So she made . . . a wise choice I think . . . . She should be given an opportunity to be reunited with her child and show this Court, and I believe since she has complied since day one that she will continue to comply with this Court and show this Court that she wants her child back.

¶18. After hearing closing arguments, the youth court stated that "this is probably the 4th time maybe that [Doe] has not shown up for Court and either said she didn't know about it or was having car trouble,"[7] and the court was "starting to have second thoughts about the placement of [Lucy and Amy] back with [Doe]." Ultimately, the court stated that because Doe had not "made any effort to have a relationship with [Catherine], other than . . . some FaceTime calls," it would "allow [Lucy] and [Amy] to stay with [Doe]" but "proceed toward TPR on [Catherine]." The court also noted, "With [Catherine] being in custody for more than 15 months we really don't have any option at this point but to change [her] permanency

---

[7] The record on appeal does not show that Doe failed to appear at four hearings. The transcript indicates that Doe was present at the December 2020, February 2021, and August 2021 hearings. The final permanency hearing was continued twice. Doe testified that she understood that the hearing was continued in February 2022 because the MDCPS case worker's "child was sick that day." There is nothing in the record to contradict Doe's testimony. Doe testified that the hearing was continued a second time because she was not aware of the hearing date "until the day before." When the hearing was held in April 2022, Doe testified that her car was running hot, and after talking with MDCPS and exploring other alternatives, she participated in the hearing by phone.

plan to adoption . . . ."[8]  The court's permanency order noted that Doe had "completed her Family Service Plan" but then further found:

> [Catherine] has been in MDCPS custody for nearly two years and [Doe] has not attempted to make more than one in person visit with her since she has been in custody (the only visit [Doe] has made . . . was in June 2021).  Further, [Doe] has gone at least a month or more at a time without making contact with [Catherine] or the foster family.  [Doe] has no bond with [Catherine] due to the fact that [Catherine] has been living with the foster parent since she was two months old.  [Doe] has not shown up for either of the last two court hearings even though she was aware that CPS was recommending that the permanency plan be changed to adoption.  [Doe] has a history of not showing up for court and blaming her failure to appear either on car trouble or not knowing about the hearing (this is disputed by CPS).  The Court found that it is in the best interest of [Catherine] to remain with the foster parents.

¶19.  Doe filed a timely motion for findings of fact and conclusions of law pursuant to Mississippi Rule of Civil Procedure 52.  On April 26, 2022, the youth court entered findings of fact and conclusions of law.  The court discussed what it perceived to be Doe's non-compliance with the six components of her family service plan: drug rehabilitation, random drug screening, maintenance of visitation, stable housing, compliance with MDCPS, and stable employment.  The court found that Doe failed to complete, or that MDCPS failed to present evidence that she had completed, any prong of the family service plan.

¶20.  First, the court found that although Doe completed inpatient drug rehab, "[t]here is

---

[8] Mississippi Code Annotated section 43-15-13(3) (Rev. 2021) provides that if a child "has been in foster care for fifteen (15) of the last twenty-two (22) months regardless of whether the foster care was continuous for all of those twenty-two (22) months, [MDCPS] shall file a petition to terminate the parental rights of the child's parents."  MDCPS is not required to file a TPR petition if "(a) [t]he child is being cared for by a relative; and/or (b) [MDCPS] has documented compelling and extraordinary reasons why [TPR] would not be in the best interests of the child."  *Id.*

no evidence that [Doe] ever completed [her outpatient addiction] program."[9] The court noted that notes from Doe's counselor at Life Core indicated that she had missed three of her four scheduled outpatient appointments from August to October 2020.[10] In addition, the court noted records showed that Doe had attended several Narcotics Anonymous meetings in November and December 2020, but "no evidence" showed that she ever attended another "meeting after [her] first permanency hearing" in December 2020.[11]

¶21. Second, the court found that MDCPS had failed to conduct true random drug screenings because MDCPS primarily scheduled her screenings to coincide with scheduled court dates.[12] The court also found that MDCPS "could have done more" to screen Doe after she moved to Itawamba County and that MDCPS "inexplicabl[y]" "never tested [Doe] for

---

[9] Multiple prior court orders from 2020, 2021, and 2022 stated that Doe "ha[d] completed rehab." Indeed, even the court's April 7, 2022 permanency order and May 2, 2022 amended permanency order stated that Doe "ha[d] completed rehab."

[10] This information is contained in a letter from a therapist at Life Core. The letter is dated October 21, 2020, but was not admitted into evidence during a hearing. It was filed with the court on April 25, 2022, after the court had entered its permanency order. The letter states that Doe attended two of her first five scheduled appointments at Life Core. The record contains no update from Life Core after October 2020.

[11] This information is contained in a document of unclear origin that was not admitted into evidence during a hearing and was filed on April 25, 2022, after the court entered its permanency order. The document is undated but does not appear to have been updated after December 2020.

[12] The court noted that "[t]here is nothing random about scheduling drug screenings on previously scheduled court dates." The court concluded that "the most logical explanation for [Doe's] numerous 'no shows' for Court" was that she "likely knew that she would have to submit to a drug screening on her hearing date."

drugs again after February 12, 2021."[13]  As a result, the court found that it could "never know whether [Doe had] been using drugs for the last fourteen (14) months."

¶22.    Third, the youth court found that Doe failed to meet the visitation requirements of her family service plan.  This finding was significant because it was the reason the youth court gave for changing Catherine's permanency plan from reunification to adoption in the court's April 7 permanency order.  The court noted that, for "unknown" reasons, Doe had moved three hours away from Bolivar County to Itawamba County, where she had "no support system."[14]  The court found that Doe "only had one face to face visit with [Catherine] since the summer of 2021," that Doe had "gone over an entire month at a time without calling or Facetiming [Catherine]," and that as a result, Catherine "does not know who [Doe] is."

¶23.    Fourth, the court found that MDCPS "dropped the ball" with regard to the family service plan's "stable housing" requirement.  The court found that Doe had not maintained stable housing; rather, she had moved at least seven times, had failed to inform MDCPS of some of her moves, and "may have actually been homeless" for a brief time.  The court found that MDCPS nonetheless "repeatedly report[ed] to the Court that [Doe] was maintaining stable housing" and "just kept acting like everything was going just fine."

¶24.    Fifth, the court found that Doe had failed to meet the requirement that she comply

---

[13] MDCPS's April 2, 2022 Court Summary contradicted this point, stating that "[t]he last drug screening was completed on August 12, 2021, at North Sunflower Hospital[,] where the results were negative," and that Doe's "drug screenings were all negative."

[14] In fact, Doe did not move for "unknown" reasons.  In August 2020, Doe informed MDCPS that she moved to Itawamba County to live with her brother after she completed inpatient drug rehabilitation because she could not afford to remain in a hotel in Cleveland.

15

with MDCPS because "huge gaps" were in Doe's "CPS file where there should be apartment leases, proof of employment and proof of visitation."

¶25.    Sixth, the court found that Doe had failed to maintain stable employment, emphasizing that there was almost no documentation of her employment and that the testimony regarding her employment was extremely limited.  The court found that "this [was] an abject failure on the part of [MDCPS]" because the agency "continued to report to the Court that Doe was gainfully employed" even though it was "clear that [Doe] ha[d] never maintained a job for more than a couple of months at [a] time."

¶26.    Finally, despite repeatedly finding that MDCPS had not only failed to monitor Doe's compliance with her service plan but also made misrepresentations to the court, the court also found that MDCPS had "continuously made reasonable efforts to reunify [Doe] with her children."  The court found it "appear[ed] that [MDCPS] decided early on . . . that they wanted to reunify all three children with [Doe] so they [could] close the case out."  The court found that MDCPS had actually *succeeded* in reunifying Doe with Amy and Lucy by "turn[ing] a blind eye to" Doe's failure to maintain stable housing and employment and by making misrepresentations to the court.[15]

¶27.    On May 2, 2022, the court also entered an amended permanency order, which again changed Catherine's permanency plan from reunification to adoption.  The amended order also specifically ordered MDCPS "to begin the termination of parental rights process on

---

[15] The court stated that "[i]n hindsight, [it did] not believe this result was in the best interest of [Amy] or [Lucy], but it [was] already done," and the court was "not going to remove [Amy and Lucy] from their mother again."

16

[Doe] (as to [Catherine] only)." Doe filed a notice of appeal.

## JURISDICTION

¶28. Although neither party challenges this Court's appellate jurisdiction, the dissent argues that we lack jurisdiction because the youth court's May 2, 2022 amended permanency order is not a final, appealable order. Because an appellate court must address issues of jurisdiction sua sponte, *e.g.*, *Hamilton v. Southwire Co.*, 191 So. 3d 1275, 1279 (¶15) (Miss. Ct. App. 2016), we address this issue before addressing the merits of Doe's appeal. We conclude that the youth court's amended permanency order was a final order because it disposed of all issues before the court, ordered MDCPS to commence a TPR proceeding against Doe, and left no issue unsettled (except for the State to file a new TPR case). Therefore, the order was appealable, and this Court has appellate jurisdiction.

¶29. This Court exercises appellate jurisdiction over appeals "from final orders or decrees of the youth court." Miss. Code Ann. § 43-21-651 (Rev. 2023).[16] Generally, an order or "judgment is final 'if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *In re M.E.V.*, 120 So. 3d 405, 407 (¶3) (Miss. 2013) (quoting *LaFontaine v. Holliday*, 110 So. 3d 785, 787 (¶8) (Miss. 2013)). In other words, "[a] final, appealable, judgment is one that adjudicates the merits of the controversy and settles all the issues as to all the parties and requires no further action by the lower court." *Jennings v. McCelleis*, 987 So. 2d 1041, 1042 (¶4) (Miss. Ct. App. 2008) (quotation marks omitted).

---

[16] During its 2024 regular session, the Legislature amended this statute effective July 1, 2024. *See* 2024 Miss. Laws ch. 531, §§ 11, 19 (S.B. 2792). However, the amendment to the statute has no effect on this appeal, which Doe perfected on June 16, 2022.

17

¶30. In abuse and neglect cases, the youth court first holds an adjudicatory hearing and enters an order adjudicating whether the child is an abused or neglected child. Miss. Code Ann. §§ 43-21-551 & 43-21-561(3) (Rev. 2023). If the youth court finds that the child is an abused or neglected child, the court must hold a disposition hearing and enter a disposition order regarding the release or custody and placement of the child. Miss. Code Ann. §§ 43-21-601 & 43-21-603(5)-(6) (Rev. 2023).[17] If the youth court places a child in foster care or finds that "reasonable efforts to maintain the child within the child's home are" or "are not required," the court must also conduct a "permanency hearing" and "determine the future status of the child." U.R.Y.C.P. 29(a), (c). The court's permanency order should make findings regarding whether the filing of a TPR petition is in the child's best interest. U.R.Y.C.P. 29(d). Thereafter, the youth court must conduct a permanency review hearing "at least annually" as long as the child remains in MDCPS's custody until "the child is adopted" or "an appropriate permanency plan is achieved." U.R.Y.C.P. 31(a).

¶31. In this case, on October 22, 2020, the youth court entered an order adjudicating Catherine to be a neglected child. The same day, the court also entered a disposition order that legal and physical custody of Catherine would remain with MDCPS while MDCPS made reasonable efforts to reunify Catherine with Doe. On December 3, 2020, the court held a permanency hearing, found that Catherine's permanency plan should remain reunification with Doe, and ordered MDCPS to continue to make reasonable efforts to achieve that plan.

---

[17] "The disposition hearing may be held immediately following the adjudicatory hearing unless a continuance is necessary to allow the parties to prepare for their participation in the proceedings." U.R.Y.C.P. 26(c)(1).

18

¶32.   The youth court thereafter held review hearings and entered permanency orders on February 25, 2021, and August 12, 2021.  In both orders, the court reaffirmed a permanency plan of reunification and ordered MDCPS to continue to make reasonable efforts to help Doe achieve that plan.  However, following a third review hearing on April 7, 2022, the court found that reunification was no longer in Catherine's best interest and changed her permanency plan to adoption.  On April 12, 2022, Doe filed a motion for findings of fact and conclusions of law.  *See* M.R.C.P. 52(a).  On April 26, 2022, the court entered findings of fact and conclusions of law that not only reaffirmed a permanency plan of adoption but also ordered MDCPS to refer the case to the Attorney General's office to file a petition to terminate Doe's parental rights.  Finally, on May 2, 2022, the court entered an amended permanency order that reaffirmed a permanency plan of adoption and ordered MDCPS to begin the TPR process.  Jane then filed a notice of appeal.

¶33.   The youth court's amended permanency order is final and appealable because it leaves nothing more for the youth court to do in this neglect case.  The filing of a TPR petition is not a mere continuation of the neglect case but rather commences a new and separate proceeding under the Mississippi Termination of Parental Rights Law.  Miss. Code Ann. § 93-15-107(1)(a) (Rev. 2021) ("Involuntary [TPR] proceedings are commenced upon the filing of a petition" "by any interested person, or any agency, institution or person holding custody of the child."); *see also id.* § 93-15-107(1)(b)-(c) (requiring new service of process on necessary parties); *id.* § 93-15-107(5) (providing for the docketing and assignment of new TPR "cases").  As the Mississippi Supreme Court noted, "[t]hough often connected to

adoptions, terminations of parental rights are distinct proceedings, governed by separate chapters of the Mississippi Code." *In re M.A.S.*, 245 So. 3d 410, 413 (¶10) (Miss. 2018). Likewise, TPR proceedings "are distinct" from a neglect case. Underscoring this distinction, this Court has held that the youth court's finding in a neglect case that MDCPS has made "reasonable efforts" to assist the parent in complying with her service plan may not be re-litigated in a subsequent TPR proceeding. *R.B. v. Winston Cnty. Dep't of Child Prot. Servs.*, 291 So. 3d 1116, 1120-22 (¶¶10-15) (Miss. Ct. App. 2019) (applying Miss. Code Ann. § 93-15-115(c) (Supp. 2016)).

¶34. Moreover, the mere fact that the youth court retains the authority to modify its permanency order, *see* U.R.Y.C.P. 31(c), does not make the order any less final or appealable. Analogously, a chancery court always retains the authority to modify a prior judgment regarding child custody,[18] but the mere existence of that authority does not render the court's custody ruling any less final or appealable. For similar reasons, the dissent's reliance on *In re M.E.V.*, 120 So. 3d 405 (Miss. 2013), is misplaced.[19] The short opinion in

---

[18] *R.A.S., Jr. v. S.S.*, 66 So. 3d 1257, 1261 (¶20) (Miss. Ct. App. 2011) ("[C]hild-custody decisions are always subject to modification until the children's emancipation. And no judgment entered is final in the sense of ending the case until that point."); *Carter v. Carter*, 735 So. 2d 1109, 1112 (¶6) (Miss. Ct. App. 1999) ("It is axiomatic that only final orders are appealable. In the context of cases involving questions of family law, the issue of finality for purposes of appeal is somewhat unique since the chancery court retains jurisdiction of such matters as . . . child custody." (citation omitted)).

[19] The dissent also cites this Court's footnote in *In re B.A.H.*, 225 So. 3d 1220, 1227 n.4 (Miss. Ct. App. 2016), which noted that the Supreme Court, via an unpublished panel order, had dismissed a prior appeal in a neglect case for lack of a final judgment. However, an "unpublished [Supreme Court] panel order has no precedential value." *Cook v. State*, 242 So. 3d 865, 877 (¶42) (Miss. Ct. App. 2017) (citing *Westbrook v. City of Jackson*, 665 So. 2d 833, 837 n.2 (Miss. 1995)).

*M.E.V.* includes only a brief description of the case's procedural history, but that case did not involve any order directing the filing of a TPR petition. *See id.* at 406 (¶2). More important, the Supreme Court did not dismiss the appeal in *M.E.V.* just because the youth court retained the authority to modify the order. Rather, the Supreme Court dismissed the appeal because the youth court explicitly stated that it was granting custody "on a trial basis only and pending the results of a home study." *Id.* at 407 (¶4). In addition, "[t]he youth court explicitly retained jurisdiction over the case and ordered [the Department of Human Services] to review the placement in six months." *Id. For those reasons*, the Supreme Court concluded that the youth court's "order fell well short of ending the litigation on the merits and leaving nothing for the youth court to do but execute a judgment." *Id.*

¶35.  In contrast, the youth court in this case did not order anything "on a trial basis only"; rather, the youth court directed the filing of a TPR petition. The dissent notes that the youth court "indicated that it would take further action once the [TPR] petition was filed and the requisite evidence was presented." *Post* at ¶58. Specifically, the youth court stated,

> To terminate [Doe's] parental rights the Attorney General's office will have to present clear and convincing evidence that the requirements set forth in [the TPR statutes] have been met. The Court will not comment further on the termination of parental rights until the petition has been filed and all evidence has been presented by the attorneys.

Here, the youth court simply—and quite properly—refrained from prejudging issues that could arise *in a distinct, yet-to-be-commenced TPR proceeding*. But the court was *not* withholding entry of a final order in this neglect case. The filing of a TPR petition will commence a distinct TPR proceeding, but the youth court's order constitutes a final and

appealable judgment in this neglect case.

¶36. In addition, we note that this Court has exercised jurisdiction over appeals from similar orders in prior cases. For example, in one neglect case, we decided an appeal from a youth court's order finding that "reasonable efforts to reunify [the child] with her parents were not required" and approving a "permanency plan of [TPR] and adoption." *In re K.M. v. Jackson Cnty. Youth Ct.*, 365 So. 3d 268, 270 (¶8) (Miss. Ct. App. 2020). In an abuse case, we decided an appeal from a youth court's permanency order granting durable legal custody to the child's grandparents. *Kevin v. MDCPS*, 341 So. 3d 1014, 1018 (¶8) (Miss. Ct. App. 2022). In another abuse and neglect case, we decided an appeal from a youth court's disposition order directing "that custody would remain with [MDCPS] and placement would remain with the children's maternal aunt, with the goal of granting durable legal custody to her in the future." *In re D.K. v. Youth Ct. of Lincoln Cnty.*, 377 So. 3d 991, 1000 (¶27) (Miss. Ct. App. 2023). The order in this case is no less final than the orders in any of these cases.

¶37. Because the youth court's amended permanency order was a final order, we have jurisdiction over Doe's appeal. We now turn to address the merits of the appeal.

**ANALYSIS**

¶38. "With respect to proceedings in youth court, this Court's standard of review is limited." *In re S.A.M.*, 826 So. 2d 1266, 1274 (¶17) (Miss. 2002). The youth court's "findings of fact will not be overturned where they are supported by substantial evidence in the record, unless manifestly wrong." *Id.* However, "if reasonable men could not have found

22

as the youth court did by a preponderance of the evidence, then the appellate court must reverse." *Id.* We review issues of law de novo. *L.B.C. v. Forrest Cnty. Youth Ct.*, 339 So. 3d 111, 113 (¶7) (Miss. 2017).

¶39. After nearly two years of working toward reunification, the youth court modified Catherine's permanency plan from reunification to adoption and ordered MDCPS to begin the process to terminate Doe's parental rights. On appeal, Doe argues that the youth court erred by modifying Catherine's permanency plan from reunification to adoption and by ordering MDCPS to begin TPR proceedings against Doe. Doe argues, inter alia, that there is not substantial evidence to support the youth court's finding that MDCPS made "reasonable efforts" to achieve reunification—a finding required for both modification of the permanency plan and initiation of TPR proceedings.

¶40. The youth court was required to find that MDCPS had made "reasonable efforts" to achieve Catherine's original permanency plan of reunification before modifying her permanency plan to adoption and termination of parental rights. Miss. Code Ann. § 43-21-613(3)(a)(ii) (Rev. 2021); U.R.Y.C.P. 31 comments & procedures; *accord* Miss. Code Ann. § 93-15-115 (Rev. 2021) (recognizing that before determining that reunification is no longer in a child's best interest, the youth court must conduct "[a] permanency hearing, or a permanency review hearing, . . . pursuant to the Uniform Rules of Youth Court Practice" and then find that MDCPS "has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan"); *R.B.*, 291 So. 3d at 1122 (¶15) (holding that this "reasonable efforts" finding must be made by a youth court following a

23

permanency or permanency review hearing). This "reasonable efforts" finding was essential before the youth court could modify Catherine's permanency plan from reunification to adoption and termination of parental rights.

¶41. At the time of the permanency hearing in the youth court, Mississippi Code Annotated section 43-21-105(gg) defined "reasonable efforts" as "the exercise of reasonable care and due diligence by [MDCPS] . . . to use appropriate and available services to prevent the unnecessary removal of the child from the home or provide other services related to meeting the needs of the child and the parents." Miss. Code Ann. § 43-21-105(gg) (Rev. 2021). While this appeal has been pending, the Legislature amended the statute to define the term in greater detail:

> "Reasonable efforts" means the exercise of reasonable care and due diligence by [MDCPS] . . . to use services appropriate to the child's background, accessible, and available to meet the individualized needs of the child and child's family to prevent removal and reunify the family as soon as safely possible consistent with the best interests of the child. Reasonable efforts must be made in collaboration with the family and must address the individualized needs of the family that brought the child to the attention of [MDCPS] and must not consist of required services that are not related to the family's needs.

2024 Miss. Laws ch. 531, § 5 (S.B. 2792). Although this more detailed definition was enacted after the hearings in this case, it is consistent with the common-sense understanding of the term "reasonable efforts." Put simply, MDCPS is required to make reasonable efforts *to help* the family comply with its service plan and achieve reunification.

¶42. In addition, section 93-15-115 provides that to make "reasonable efforts," MDCPS must "develop[] a service plan for the reunification of the parent and the child" and "diligently assist the parent in complying with the service plan." Miss. Code Ann. § 93-15-

24

115; *see Chitwood v. Stone Cnty. Dep't of Child Prot. Servs.*, 364 So. 3d 644, 646 n.5 (Miss. Ct. App. 2020). Therefore, at minimum, MDCPS had a statutory responsibility to develop a service plan aimed at achieving reunification, identify the requirements that Doe needed to satisfy to achieve reunification, and "diligently" help Doe meet those requirements.

¶43. The youth court ultimately concluded that MDCPS "continuously made reasonable efforts to reunify [Doe] with her children throughout the life of this case." But to support that conclusion, the youth court pointed only to MDCPS "turn[ing] a blind eye" to Doe's shortcomings, misrepresenting facts to the court, "report[ing] to the [c]ourt that everything was going just fine," and just wanting to "close the case out." Such actions by MDCPS are not "reasonable efforts" to assist Doe *in actually satisfying the requirements of her service plan*. Indeed, this all amounts to sweeping problems and setbacks under the rug, not making reasonable efforts to address the problems. This is antithetical to the statutory requirements that MDCPS must develop a service plan aimed at reunification, exercise due diligence, and make reasonable efforts *to help the family comply with the plan*.

¶44. On the record before us, there is no substantial evidence to support a finding that MDCPS made reasonable efforts to assist Doe in achieving the goals of her service plan. To begin with, in its April 2022 findings of fact and conclusions of law, the youth court found that MDCPS had misrepresented both its efforts and Doe's successes throughout this case and thus discredited most, if not all, of MDCPS's prior reports and testimony regarding their own efforts and Doe's efforts. From its findings of fact and conclusions of law, the youth court relied heavily on the testimony of Catherine's foster mother, Carrie, but her testimony

25

does not recount any efforts that *MDCPS* made. Indeed, the only evidence of MDCPS's efforts were the reports of MDCPS itself and the testimony from its case workers. But because those reports and that testimony were found to be misrepresentations or otherwise discredited by the youth court, they are not substantial evidence that MDCPS made reasonable efforts.

¶45. The youth court's own findings of fact do not support a finding that MDCPS made any "reasonable efforts" to assist Doe in completing her service plan. Doe's family service plan required her to "attend and complete drug rehab" and "submit to random drug screens." During permanency review hearings, MDCPS informed the youth court that Doe had submitted to "numerous . . . drug screenings and all . . . ha[d] been negative." MDCPS also informed the court Doe "ha[d] completed" "her drug rehab." MDCPS's reports to the court were consistent with evidence that Doe had completed an inpatient drug rehab program, had tested negative on several drug screenings, and had never tested positive for drug use. If different or additional drug screenings or rehab programs were necessary, MDCPS should have told Doe and the court what else was required of her. Despite MDCPS's assurances to Doe and the court that Doe had complied with these requirements of her service plan, the court ultimately found that she had not complied and that the court could "never know whether [Doe] ha[d] been using drugs." In so finding, the court expressly blamed *MDCPS* for not requiring Doe to submit to enough drug screenings and for not doing enough to follow up with Doe after she moved to Itawamba County. If—as the youth court found—Doe was not in full compliance with her service plan, then MDCPS's failures and

26

false assurances to Doe were the opposite of "reasonable efforts" to assist Doe. Instead, MDCPS effectively undermined Doe's efforts to reunify her family.

¶46. The youth court also found that Doe had failed to exercise adequate visitation with Catherine and thus failed to satisfy the visitation prong of her family service plan. The court concluded that sporadic FaceTime visitation was insufficient. But the court made no finding that MDCPS made any effort—let alone *reasonable* efforts—to facilitate more frequent or in-person visitation with Catherine. MDCPS's records show that in August 2020—less than three months after MDCPS took custody of the children—Doe "ask[ed] about visitation with her children" and "stated that she wanted to see her children face2face." However, an MDCPS supervisor told Doe "that due to the pandemic . . . no one was letting anyone in their home" and that "until the pandemic is over or ordered by the court, [Doe would] have to have her visits with her children via FaceTime or [G]oogle [D]uo."[20] Moreover, at each subsequent permanency or permanency review hearing, MDCPS represented that Doe was exercising sufficient visitation to satisfy her service plan and achieve reunification, and the youth court made findings in reliance on MDCPS's representations. For example, in both February 2021 and August 2021, MDCPS reported that Doe was maintaining visitation, and the youth court found that Doe "ha[d] completed her Family Service Plan." In addition, in its December 2021 report to the youth court, MDCPS stated that Doe was "maintaining connections with [Catherine]" and that the three "girls [were] able to communicate and visit with each other monthly with the visits being via Facetime [because] the [foster parents had]

_____

[20] There is no evidence in the record as to when, if ever, Doe was told that this restriction had been lifted.

relocated to [Rankin County]." That report also stated that MDCPS would "update [Doe's] visitation plan," but there is no evidence that MDCPS ever followed through. In any event, MDCPS's December 2021 report stated that Doe had completed her service plan, that "no additional services [were] needed," and that if Doe continued "making progress," the agency would "request[] that [Catherine] begin [a] Trial Home Placement" with Doe at the next scheduled hearing in February 2022.

¶47. At the April 2022 hearing, the youth court seemed to appreciate for the first time that Doe had exercised very little in-person visitation with Catherine and only sporadic FaceTime visitation. We understand the youth court's concern in this regard. However, prior to April 2022, the youth court had consistently found that Doe was in compliance with all aspects of her family service plan. Moreover, even if we assume that—contrary to all of the youth court's prior findings—Doe was not in compliance with her plan, no substantial evidence in the record supports a finding that MDCPS made "reasonable efforts" to help Doe achieve compliance. Yet again, what the record shows is that MDCPS *repeatedly* assured Doe and the youth court that Doe *was* in compliance with her service plan and *was* maintaining adequate visitation under the circumstances. False assurances that a parent is in compliance with her plan are the very opposite of "reasonable efforts" to help the parent achieve compliance and reunification.

¶48. The youth court also found that MDCPS "dropped the ball" by "report[ing] to the [c]ourt that [Doe] was maintaining stable housing." The court then found—contrary to express findings in the court's prior orders—that Doe had failed to satisfy this prong of her

service plan. The court discussed some of Doe's various residences during the life of the case, but the court did not find that MDCPS had made any reasonable efforts to assist Doe in this regard. Indeed, the youth court only observed that despite Doe's perceived failure, the agency "just kept acting like everything was going just fine." The agency's false assurances to Doe and the youth court that "everything was going just fine" are not "reasonable efforts" to assist Doe in actually achieving her plan for reunification.

¶49. The youth court also found that Doe failed to comply with her service plan by failing to provide MDCPS with documentation of her living arrangements or new addresses. But at every stage of the case, an MDCPS worker had testified that Doe had done everything asked of her. Indeed, there is no substantial evidence to show that Doe failed to comply with MDCPS's instructions at any point in this case. Moreover, there is no record evidence that MDCPS ever requested any additional documentation or that Doe failed to comply with such a request. Thus, there is no substantial evidence to find that Doe ever failed to cooperate or comply with MDCPS.

¶50. Finally, the youth court found that MDCPS was "an abject failure" in ensuring that Doe maintained stable employment. The record shows that Doe was employed at various times during the case. To the extent that the court was concerned about MDCPS's failure to document Doe's employment record, there is no indication that MDCPS ever requested additional documentation from Doe. There is no also no evidence of any other "reasonable efforts" that MDCPS made to assist Doe in satisfying this requirement of her service plan. As with other aspects of Doe's service plan, the record shows that MDCPS repeatedly

29

assured Doe and the court that she was in compliance with her plan.

¶51. To summarize, the youth court was required to find that MDCPS had made "reasonable efforts" to help Doe achieve reunification before modifying Catherine's permanency plan from reunification to adoption and termination of parental rights. The youth court found instead that MDCPS had "turned a blind eye" to Doe's perceived shortcomings and that MDCPS had made repeated misrepresentations to the court (and to Doe) that Doe was in compliance with all aspects of her service plan. Those failures by MDCPS are not "reasonable efforts" to help Doe achieve reunification. They are the very opposite. Put simply, there is no substantial evidence to support a finding that MDCPS made "reasonable efforts" to help Doe achieve reunification. Therefore, we reverse and remand for the youth court to order MDCPS to make reasonable efforts to reunify Doe and Catherine.

¶52. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶53. If this case were properly before this Court for our review, I would wholeheartedly agree with the majority's analysis on the matter.[21] However, I do not believe the matter derives from a final, appealable order; therefore, it is not properly before this Court. Thus,

---

[21] After a careful review of the record, I believe the youth court did not make reasonable efforts to adhere to the reunification plan. Instead, it appears the court used insufficient evidence to terminate Doe's parental rights in order to give the foster family a clear opportunity to adopt Catherine, even though Doe was doing everything required by her.

I respectfully dissent.

¶54. Even though neither party raised this jurisdictional issue on appeal, we still address it because "an appellate court must address issues of jurisdiction on its own motion." *Hamilton v. Southwire Co.*, 191 So. 3d 1275, 1279 (¶15) (Miss. Ct. App. 2016) (citing *Gallagher v. City of Waveland*, 182 So. 3d 471, 474 (¶13) (Miss. Ct. App. 2015), *cert. denied*, 181 So. 3d 1010 (Miss. 2016)); *see also* Order, *Hartzler v. Bosarge*, No. 2019-CT-01606-COA, 2022 WL 1222751, at *1 (Miss. Ct. App. Apr. 11, 2022) (en banc order) ("[I]t is well settled that jurisdictional issues 'may be raised by the Court sua sponte or by any party at any time . . . .'" (quoting *Davis v. City of Jackson*, 240 So. 3d 381, 383 (¶9) (Miss. 2018))).

¶55. "[A]n appeal is not a matter of right but is subject to . . . statutory provisions, and the basic requirement is that appeals are proper only if from a final judgment." *In re M.E.V.*, 120 So. 3d 405, 406-07 (¶3) (Miss. 2013). This rule also applies to appeals stemming from youth court proceedings. *See* Miss. Code Ann. § 43-21-651 (Rev. 2021);[22] U.R.Y.C.P. 37 ("Appeals from final orders or decrees of the court shall be pursuant to the Mississippi Rules of Appellate Procedure[ ].").

¶56. A final, appealable judgment is one that "'adjudicates the merits of the controversy and settles all issues as to all the parties and requires no further action by the trial court.'"

---

[22] The statute was amended by the Legislature during its 2024 regular session, and this amendment became effective on July 1, 2024. 2024 Miss. Laws ch. 531, § 11 (S.B. 2792). However, this change did not apply retroactively. Thus, because Doe perfected her appeal on June 16, 2022, the amendment to the statute has no effect on the issues before this Court.

*Humphrey v. Holts*, 364 So. 3d 613, 615 (¶7) (Miss. 2022); *Walters v. Walters*, 956 So. 2d 1050, 1053 (¶8) (Miss. Ct. App. 2007). In the case of *In re M.E.V.*, the youth court's permanency order granted custody of the child to the biological father on a trial basis. *In re M.E.V.*, 120 So. 3d at 406 (¶1). The order further illustrated that the issues were not settled, *see Banks v. City Fin. Co.*, 825 So. 2d 642, 645 (¶9) (Miss. 2002),[23] by mandating DHS to review the placement in six months. *In re M.E.V.*, 120 So. 3d 406 (¶4). Therefore, we held that the order was not final.

¶57. Likewise, in the case of *In re B.A.H.*, the youth court entered a permanency order finding that it was in the child's best interest to change the permanency plan from reunification to termination of parental rights and adoption. *In re. B.A.H.*, 225 So. 3d 1220, 1227 (¶14) (Miss. Ct. App. 2016). A termination-of-parental-rights petition was not filed, however, until sixteen months later. *Id.* at (¶15). During this sixteen-month period, the mother appealed the youth court's order, but the Mississippi Supreme Court dismissed her appeal because the permanency order was not a final, appealable judgment. *Id.* at (¶15) & n.4.

¶58. Here, the youth court filed an "Amended Permanency Order" on April 7, 2022, which officially shifted the original permanency plan of reunification to adoption and termination of parental rights. Subsequently, the youth court judge's April 26 "Findings of Facts and Conclusion of Law" decreed "[t]hat it is in best interest of [Catherine] for the permanent plan to be changed to adoption; and, . . . [t]hat CPS shall refer this case to the Attorney General's

---

[23] *Overruled on other grounds by Sawyers v. Herrin-Gear Chevrolet Co.*, 26 So. 3d 1026, 1032 (¶15) (Miss. 2010).

office to proceed with the termination of parental rights for [Catherine]." The youth court also stated in the April 26 order that the case would

> **be referred to the Attorney General's office to proceed with the termination of [Doe's] parental rights as to [Catherine]**. To terminate [Doe's] parental rights the Attorney General's office will have to present clear and convincing evidence that the requirements set forth in Miss. Code Ann. § 93-15-115 and 93-15-121 have been met. The Court will not comment further on the termination of parental rights until the petition has been filed and all evidence has been presented by the attorneys.

(Emphasis added). Similar to the case of *In re B.A.H.*, the permanency order here changed the permanency plan from reunification to adoption and the termination of parental rights. Moreover, the youth court judge indicated that it would take further action once the termination-of-parental-rights petition was filed and the requisite evidence was presented.

¶59. Additionally, "under the 2016 amendment to the adoption statute, unless and until parental rights were terminated, the chancellor could not grant a contested adoption." *In re M.A.S.*, 245 So. 3d 410, 413 (¶8) (Miss. 2018); *see* Miss. Code Ann. § 93-17-7(1) (Rev. 2021). In this instance, the April 26 "Findings of Facts and Conclusion of Law" declared the shifting of the permanency plan from reunification to termination of parental rights and adoption, to which Doe responded with a notice of appeal. Even though the court ordered MDCPS to begin the termination of Doe's parental rights for Catherine in the court's April 26 order, Doe's parental rights had not yet actually been terminated. Thus, the youth court could not properly grant the contested adoption until Doe's parental rights had been fully terminated, which furthers my assertion that this was not a final, appealable order.

¶60. Because the circumstances of this case closely align with the facts and circumstances

33

of *In re M.E.V.* and *In re B.A.H.*, I would find that the April 26 order was not a final, appealable judgment and should not be reviewed by this Court. For this reason, I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION.**